1  ROBERT P. DOTY (STATE BAR NO. 148069)
   rdoty@coxcastle.com
2  PETER M. MORRISETTE (STATE BAR NO. 209190)
   pmorrisette@coxcastle.com
3  SCOTT J. LICHTIG (STATE BAR NO. 243520)
   slichtig@coxcastle.com
4  COX, CASTLE & NICHOLSON LLP
   555 California Street
5  10th Floor
   San Francisco, CA 94104-1513
6  Telephone: (415) 392-4200
   Facsimile: (415) 392-4250
7
8  MICHAEL G. BIDDLE, General Counsel (139223)
   mbiddle@ci.emeryville.ca.us
9  MICHAEL A. GUINA, Assistant General Counsel (203380)
   1333 Park Avenue
10 Emeryville, CA 94608
   Telephone: (510) 596-4300
11 Facsimile: (510) 658-8095

12 Attorneys for Plaintiffs,
   CITY OF EMERYVILLE & EMERYVILLE
13 REDEVELOPMENT AGENCY

14                    UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| 17  CITY OF EMERYVILLE and the EMERYVILLE REDEVELOPMENT AGENCY, | Case No. C99-03719 WHA |
| 18        Plaintiffs, | **STIPULATION BY CITY OF EMERYVILLE, EMERYVILLE** |
| 19        vs. | **REDEVELOPMENT AGENCY, AND SHERWIN-WILLIAMS TO** |
| 20  ELEMENTIS PIGMENTS, INC., a Delaware corporation; THE SHERWIN-WILLIAMS | **SUPPLEMENT THE RECORD RELATING TO THE PENDING MOTION** |
| 21  COMPANY, an Ohio corporation; PFIZER, INC., a Delaware corporation; A&J TRUCKING | **TO ENFORCE SETTLEMENT AGREEMENT WITH DEPOSITION** |
| 22  COMPANY, INC. a dissolved California corporation; BAKER HUGHES, INC., a | **TESTIMONY FROM SEPTEMBER 29, 2009** |
| 23  Delaware corporation; ARTHUR M. SEPULVEDA and JOSEPHINE SEPULVEDA, | Date:    October 16, 2008 |
| 24  individually and as TRUSTEES OF THE SEPULVEDA FAMILY LIVING TRUST; and | Time:    8:00 |
| 25  THE SEPULVEDA FAMILY LIVING TRUST, , | Dept:    Courtroom 9 |
|                                          | Judge:   Hon. William H. Alsup |
| 26        Defendants. | |

27

28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

STIPULATION BY CITY OF EMERYVILLE
EMERYVILLE REDEVELOPMENT AGENCY AND
SHERWIN WILLIAMS TO SUPPLEMENT RECORD

There is now pending before this Court a motion by Defendant Sherwin-Williams Company styled *Motion To Enforce Settlement Agreement And Order*. In its Motion, Sherwin-Williams cites, among other things, deposition testimony and other representations by the Redevelopment Agency's environmental consultant (Mr. Earl James of Erler & Kalinowski, Inc. ("EKI"). On Monday, September 29, Mr. James provided further deposition testimony.

The Redevelopment Agency believes that some of Mr. James' recent testimony should be included in the record. That testimony is relatively brief, 13 pages (attached hereto as Exhibit A). Sherwin-Williams has agreed to stipulate to allow the Redevelopment Agency to submit that testimony, attached as Exhibit A, for the record, obviating the need for a motion or hearing. In turn, the Agency has agreed to stipulate to similar supplementation of the record by Sherwin-Williams if Sherwin-Williams determines that relevant material bearing on the issues addressed in Exhibit A is not already in the record.

DATED: October 6, 2008                    COX, CASTLE & NICHOLSON LLP

By: /s/ Robert Doty / SJL
ROBERT P. DOTY
Attorneys for Plaintiffs,
CITY OF EMERYVILLE AND EMERYVILLE REDEVELOPMENT AGENCY

DATED: October 6, 2008                    WACTOR & WICK LLP

By: /s/ William D. Wick
WILLIAM D. WICK
Attorneys for Defendant,
SHERWIN-WILLIAMS' COMPANY

///

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

- 1 -

STIPULATION BY CITY OF EMERYVILLE
EMERYVILLE REDEVELOPMENT AGENCY AND
SHERWIN WILLIAMS TO SUPPLEMENT RECORD

1   GOOD CAUSE APPEARING, IT IS SO ORDERED.
2
3   _____
4                                   Judge William Alsup
    District Court
5   Dated: October 10, 2008
6
7   49195\128172v1
8
...
28

LAW OFFICES OF
COX, CASTLE &
NICHOLSON LLP
SAN FRANCISCO

- 2 -

STIPULATION BY CITY OF EMERYVILLE
EMERYVILLE REDEVELOPMENT AGENCY AND
SHERWIN WILLIAMS TO SUPPLEMENT RECORD

Court stamp: IT IS SO ORDERED / [signature] / Judge William Alsup / UNITED STATES DISTRICT COURT / NORTHERN DISTRICT OF CALIFORNIA

**EXHIBIT A**

0929Earl_James_Vol_4[1].txt

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

---oOo---

EMERYVILLE REDEVELOPMENT            )
AGENCY, A BODY POLITIC,             )
                                    )
        Plaintiffs,                 )
                                    )
    vs.                             ) Case No. RG-06-267594
                                    ) (Consolidated with
HOWARD F. ROBINSON, JR. and         ) RG-06-267600 and
JEANNE C. ROBINSON, et al.          ) RG-07-332012)
                                    )
        Defendant.                  )
_____

AND RELATED CROSS-ACTIONS.
_____/


DEPOSITION OF EMERYVILLE REDEVELOPMENT AGENCY

(PERSON MOST QUALIFIED - EARL D. JAMES, R.G.)

Volume 4

taken before DEBORAH E. TAGGART, CSR

In and for the County of Sonoma

State of California

CSR No. 5942

Page 1

Exhibit A



```
                    0929Earl_James_Vol_4[1].txt
20
21
22
23
24
25
                              519

        P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08



1           EARL D. JAMES, R.G.

2   having been first duly sworn, testified as follows:

3

4           EXAMINATION BY MR. WICK

5   MR. WICK:  Q.  Good morning, Mr. James.  My name is

6   Phil Wick and I'm counsel to the Sherwin-Williams

7   company in this case.  And my initial examination at

8   least is going to be brief because I've reviewed the

9   extensive testimony you've already given pretty

10  carefully, so I could avoid as best as possible to ask

11  you to answer questions you've answered back in May.

12         I did want to ask you, though, back on

13  May 21st -- if you've got the transcript here, I wanted
```

0929Earl_James_Vol_4[1].txt

14  to go to Page 135 of the transcript from May 21st.

15      MR. DOTY: Counsel, I'll let him look at mine.

16  I'll warn you ahead of time I made certain annotations

17  on my page. I don't know that he can read them even if

18  he tries.

19      MR. WICK: Yeah.

20      MR. DOTY: Whichever you prefer.

21      MR. WICK: It's fine for him to read the

22  annotations, if he wants to. I've got to focus on the

23  question that starts on line 16 and goes to line 22, and

24  maybe you can be reading it and I'll read it for the

25  court reporter.

                         520

    P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08

1       It says, "Going back to figures 5-1A through

2  -C for the metals-only area we see on the Robinson

3  property, the city believes the responsible sources for

4  those metals are either the operations you've already

5  described at the Robinson property, the fills

6  themselves, or the Sherwin-Williams and potentially the

7  iron oxide pigments plants, correct?"

0929Earl_James_Vol_4[1].txt

8       And your answer was, "Correct."

9       My question today is: Have you reviewed

10 anything or received any information that would cause

11 you to change the response you had on May 21st and give

12 a different response today?

13   A.  No.

14       MR. WICK: All right, thanks. That's all I have.

15            (short recess taken)

16 ~~more on just the Adams' property and the Adams~~

17            EXAMINATION BY MR. SHIBER

18       MR. SHIBER: Q. All right, we are back on the

19 record.

20       Mr. James, my name is Bill Shiber, and as I

21 think you know, I represent the Adams defendants. And

22 like Mr. Wick, I want to try to avoid kind of trying to

23 go over the ground that was covered in the original

24 deposition or the original two days, I guess, of

25 deposition. But what I'm going to try to do is focus

                        521

P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08

0929Earl_James_Vol_4[1].txt

8  ~~location on or near a former rail spur and whatever~~

9  chemicals were found at that location were found.

10  Q.  Okay, that was my understanding when I

11  reviewed the testimony as well.

12     So I'm about to move into another area of

13  questioning, and it feels like people are noticing that

14  it's nearly 5:00 o'clock. So let's take a break and

15  determine what we are going to do with the rest of our

16  15 minutes here and make a note on the record after we

17  make that determination.

18     (discussion off the record)

19  MR. DOTY: Back on the record.

20

21     EXAMINATION BY MR. DOTY

22  MR. DOTY: Q. So Mr. James, my name's Robert Doty.

23  Obviously, you know me from this case and prior cases.

24     I want to ask you a couple of follow-up

25  questions from the conversation that you had at the

697

P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08

1  start of the day with Mr. Wick. This relates to some

0929Earl_James_Vol_4[1].txt
2  testimony you gave on the first day. The deposition --

3  do you still have Exhibit 5 out with you?

4    A. Yes.

5    Q. Let me start with the metals contamination on

6  Site B, most specifically the Robinson property. From

7  your work on Site B and your work on Site A, are you

8  aware of any information that causes you to believe that

9  the metals contamination at Site B was originally on the

10 ground at Site A and then migrated somehow to Site B?

11   A. No.

12   Q. With respect to the hydrogen sulfide material

13 at the southwest corner of the Robinson site, are you

14 aware of any information that causes you to believe that

15 any of that material was originally on the ground at

16 Site A and somehow migrated to Site B?

17   A. No.

18   Q. A couple of questions for you regarding the

19 groundwater contamination. Was there a groundwater

20 contamination aspect to the Site A cleanup?

21   A. Yes.

22   Q. What was the focus of that effort?

23   A. Primarily it involved arsenic in the

Page 234

0929Earl_James_Vol_4[1].txt

24 groundwater. And there are source areas, areas of high

25 concentrations of arsenic in groundwater south of the

698

P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08

1 boundaries between Site A and Site B. And we did some

2 excavation into the water table in those source areas,

3 and we are monitoring the migration of the residual

4 primarily arsenic contamination from Site A pretty much

5 directly west into the storm drain along Shellmound

6 Street and out towards Temescal Creek.

7    Q. And there is, as we discussed some today, a

8 groundwater component to the remediation of Site B; is

9 that correct?

10    A. Yes.

11    Q. Is the groundwater remediation at Site B at

12 all focused on arsenic?

13    A. No.

14    Q. Is it fair to say from your perspective that

15 the groundwater remediation at Site A and the

16 groundwater remediation at Site B are separate and

17 distinct from mediation efforts?

Page 235

0929Earl_James_Vol_4[1].txt

18   A. Yes.

19      MR. DOTY: I think then I have no more questions at

20 this point. Thank you.

21      MR. WICK: I have a few.

22

23         FURTHER EXAMINATION BY MR. WICK

24      MR. WICK: Q. Mr. James, how do you know whether

25 or not contaminants from Site A originally on the ground

                                   699

   P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08


 1 at Site A migrated or did not migrate to Site B?

 2    A. In general, the distribution of the

 3 contaminants in soil and the direction of the

 4 groundwater gradients would say that that's not possible

 5 as a source of what we find on Site B.

 6    Q. Didn't you testify in your earlier deposition

 7 that not only was it possible, but that you thought it

 8 was likely that there were contaminants from Site A that

 9 were transported via the air to Site B?

10    A. Yes.

11    Q. So how does that affect your answer as to

                              Page 236

0929Earl_James_Vol_4[1].txt

12 whether or not contaminants from the Site A may have

13 migrated to Site B?

14   A.  There's a distinction there. What we said was

15 on the ground. And you asked in your previous question

16 on the ground at Site A, migrate through the ground to

17 Site B. It's a different pathway through the air from

18 Site A to B.

19   Q.  So contaminants on Site A may have migrated to

20 Site B via airborne transport, right?

21   A.  As a result of the operations on Site A, yes.

22   Q.  Explain a little bit to me for the basis for

23 your conclusion that contaminants did not migrate via

24 the ground.

25   A.  As I explained, the nature of the
                                              700

P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08

1 contaminants, the particular metals, TPH and the

2 hydrogen sulfide impacts that we see, are not amenable

3 to the sort of lateral migration in soil that would be

4 required from Site A to Site B, and the groundwater

5 gradients are in a direction that would not suggest that

0929Earl_James_Vol_4[1].txt
6  they would migrate in groundwater from Site A to Site B

7  and somehow recontaminate soil and groundwater.

8    Q.  Have you been retained by the city or the

9  redevelopment agency as an expert on these questions?

10   A.  No.

11   Q.  Have you been asked to focus on these

12 questions in the course of doing your work for the

13 redevelopment agency?

14   A.  No.

15   Q.  So this is your lay opinion based on the work

16 you've done for the redevelopment agency; is that

17 correct?

18   A.  No.  It's based on our observations of the

19 physical facts at the site.

20   Q.  You earlier testified that you believed that

21 arsenic and hydrogen sulfide on Site B emanated from the

22 Sherwin-Williams operations on Site A; is that correct?

23   A.  Yes.

24   Q.  And do you have a theory as to how it got

25 there?

                                701

   P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08

0929Earl_James_Vol_4[1].txt

1    A. Well, the two methods that I have thought

2 about are the airborne deposition that we previously

3 discussed and direct release to the ground on Site B.

4 That southern portion of Site B was not developed for a

5 period of time up until the '50s during which time there

6 were operations occurring on the Sherwin-Williams

7 property adjacent to it. And I don't see anything in

8 the photo record, for instance, that would say that

9 there weren't various activities that occurred that went

10 over that property boundary as part of the operations of

11 the Sherwin-Williams facility.

12   Q. But you don't know one way or the other;

13 you're just guessing, right?

14   A. Not guessing, but I can make observations as

15 to what I can see in the air photos.

16   Q. And you're saying you saw in the -- what did

17 you see in the air photos?

18   A. What I see in the air photos is the adjacency

19 of the operations and no physical barriers, as it were,

20 between the two areas.

21   Q. And so it would be your expectation that

Page 239

0929Earl_James_Vol_4[1].txt

22 without that physical barrier, it would be reasonable to

23 presume that contaminants from Site A could end up on

24 Site B, correct?

25    A. That people, in the course of operations in

702

P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08

1 those periods of time, may not have been particularly

2 careful about exactly where they were doing various

3 things.

4    Q. And in a situation like that, where there is

5 not a physical barrier, would your assumption generally

6 be that if you have a facility, an operating facility

7 with contaminants, that those contaminants would not

8 respect the boundaries of the property line?

9    MR. DOTY: I'm going to object to that question as

10 vague and ambiguous.

11    A. Well, certainly in regards to the airborne

12 pathway, they are not going to respect the property

13 line. And in terms of the human operational element, it

14 is my experience in having looked at a lot of these old

15 facilities and just seeing how people work, that they

Page 240

0929Earl_James_Vol_4[1].txt

16 didn't necessarily worry particularly about those sorts

17 of issues. Particularly at that time from the -- I

18 forget exactly when Sherwin-Williams started operations,

19 but from the '30s and '40s, this was pretty close to the

20 edge of the Bay and people went out to the edge of the

21 Bay and did what they did, so --

22     MR. WICK: Q. Are there any contaminants of

23 concern relating to the groundwater remediation on Site

24 A, other than arsenic?

25     A. The groundwater remediation on Site A. There

703

P.M.Q., EARL D. JAMES, R.G., VOL. 4, 9/29/08

1 are CVOCs in groundwater on Site A, but it was our

2 belief that they were from an upgradient source and just

3 crossed the Site A property towards the west.

4     MR. DOTY: West or east?

5     A. West. It came from the east towards the west

6 across Site A; in that northern portion.

7     MR. WICK: That's all I have.

8     MR. DOTY: We're done for today.

9     (Whereupon the deposition adjourned at 5:10 p.m.)

Page 241